United States District Court
Southern District of Texas
**ENTERED**
March 30, 2021
Nathan Ochsner, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:19-cv-381

ZT Employment Services, LLC, *Plaintiff*,

v.

Gallagher Benefit Services, Inc., *Defendant*.

## MEMORANDUM OPINION AND ORDER

Jeffrey Vincent Brown, United States District Judge.

In this professional-negligence and breach-of-contract case, the defendant moves to dismiss the plaintiff's complaint for failure to state a claim under Rule 12(b)(6). *See* Dkt. 17. After reviewing the motion, response, reply, the other pleadings, and the applicable law, the court denies the motion.

I.  **Background**

The plaintiff, ZT Employment Services, LLC, is a "professional employer organization that provides employment management services," such as handling "employee payroll, employee benefits, workers' compensation, and employee recruitment and training." Dkt. 13 at ¶ 7. The defendant, Gallagher Benefit Services, Inc., is an insurance broker and benefits consultant. *Id.* at ¶ 8.

In 2015, ZT hired Gallagher to assist ZT create and manage its own "self-funded" employee medical benefit plan. In a "self-funded" plan, the employer collects premiums from its employees to cover projected medical claims, but the employer is ultimately liable "for all claims payable under the plan." Dkt. 17, PDF at 8 (citing *e.g., Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1324 (11th Cir. 2014)). In contrast, in a "fully insured" plan, in exchange for a fixed fee, a third-party insurance carrier bears the risk for a plan's liabilities. *Id.*

In 2016, ZT launched its self-funded benefits plan. It alleges, however, that by 2017 its plan was underfunded by $1.6 million, and it was forced to cover the shortfall with its own funds. Dkt. 13. ¶ 12.

ZT sued Gallagher in November 2019. *See* Dkt. 1. In March 2020, the court granted ZT leave to file an amended complaint. *See* Dkt. 13. In it, ZT specifically alleges:

- Gallagher played a critical role in strategizing, designing and creating [ZT's] self-funded employee benefits plan. Gallagher directed [ZT] on various facets of the management and administration of the plan, including the plan's financial structuring – which includes the collection of premiums from employees and affiliate entities, and obtaining stop-loss coverage to cover large individual and aggregate claims that fall beyond a certain threshold.

- Among the services Gallagher was hired to do, Gallagher made actuarial calculations, projected employee claims, forecasted costs, and instructed [ZT] on how to sufficiently fund its

employee benefits plan. Specifically, in order to make sure that [ZT's] employee benefits plan would have enough funds to cover the claims that would be incurred by its beneficiaries, [ZT] set the plan's premium rates - the premium amounts collected from [ZT's] employees and affiliate employers – as directed by Gallagher.

- Gallagher failed to properly provide the expert services it promised, to the financial detriment of [ZT]. Not only did Gallagher consistently underperform and fail to deliver many of the services it was hired to do, Gallagher's financial claims projections and forecasts were substantially inaccurate. Because [ZT] set its premium rates as directed by Gallagher, the premium funds collected by the plan were considerably short, causing [ZT's] benefits plan to be woefully underfunded by $1.6 million dollars for the 2017 plan year. [ZT] was ultimately forced to cover the $1.6 million dollar shortage with its own funds, causing significant financial loss to [ZT].

- Furthermore, contrary to [ZT's] instructions and communications to Gallagher, Gallagher misled [ZT] into obtaining a deficient stop-loss policy that inadequately protected [ZT] in the event that actual claims exceeded Gallagher's claims projections. Specifically, Gallagher's flawed design for the [ZT] self-funded plan left a gaping hole between the amount of premium funds actually collected by the plan for funding claims (which was less than $7,000,000.00 for the 2017 plan year) and the triggering aggregate stop-loss attachment point of $12,609,815 (a $5.6 million dollar difference). In essence, Gallagher sold and procured a useless 2017 stop-loss policy to [ZT] that cost [ZT] $986,318.00 in stop-loss premiums, when the stop-loss policy would only pay out a maximum benefit of $1,000,000.00 and only trigger in the aggregate if [ZT] incurred $5.6 million dollars more in claims than [ZT] budgeted.

- [ZT] paid over $179,000.00 in commissions and fees to Gallagher for the incompetent services provided by it during the 2016 and 2017 plan years.

3

Dkt. 13 ¶¶ 10–14 (footnotes omitted). Based on these allegations, ZT asserts two claims: negligence and breach of contract. *Id.* ¶¶ 15–25.

On April 3, 2020, Gallagher moved to dismiss. ZT responded, and Gallagher replied to the response. *See* Dkts. 21, 23.

### A. Motion-to-Dismiss Standard

Rule 8 provides that a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Under Rule 12(b)(6), a court should dismiss a case if a plaintiff's complaint fails "to state a claim upon which relief can be granted." *Id.* 12(b)(6); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–63 (2007). When considering a motion to dismiss, the court accepts as true all well-pleaded facts and views those facts in a light most favorable to the plaintiff. *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995). But the complaint must provide some factual basis that allows the inference that the defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555–56.

## II. Analysis

The *Twombly-Iqbal* "two-step" approach requires the court to first identify all conclusory allegations and disregard them. *Iqbal*, 556 U.S. at 678. Second, the court

4

must determine whether the remaining allegations allow a plausible inference of liability. *Id.* at 679.

The court will first consider whether the allegations allow a plausible inference of liability for ZT's negligence claim and then turn to the breach-of-contract claim. The court will conclude by considering whether those two claims must fail as a matter of law on causation and damages grounds, elements which both claims share.

### A. Negligence

To establish a prima facie case for negligence, the plaintiff must show: (1) the existence of a legal duty owed by the defendant, (2) a breach of that duty, and (3) damages (4) proximately resulting from the breach. *Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008) (applying Texas law).

Gallagher argues that ZT has not explained why Gallagher owes it any duty. In that same vein, Gallagher notes that as self-funded plans are unique, ZT must supply specific facts to show that Gallagher acted negligently or breached any agreements. Dkt. 17 at 12. Moreover, Gallagher argues that because ZT accuses Gallagher of misleading it into a deficient stop-loss policy, Rule 9's heightened pleading standard applies, which ZT failed to satisfy. *See* FED. R. CIV. P. 9(b).

The court will first consider whether Rule 9's heightened pleading standard applies instead of Rule 8. *See* Dkt. 17, PDF at 10 n. 3; Dkt. 23 at 7 n.3.

Rule 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." ZT maintains it has not asserted any fraud claims. Dkt. 21 at 6. The court agrees. ZT consistently complains that Gallagher's actions were inadequate or not delivered as promised—but there are no allegations that Gallagher tricked or intentionally lied to ZT. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) ("The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.").

Fraud and negligent misrepresentation both share as an element that a false representation was made, but negligent misrepresentation is distinct from fraud, particularly because a negligent misrepresentation lacks fraudulent intent. *See Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.3d 439, 442 (Tex. 1991) (defining negligent misrepresentation under Texas law); *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 474 (5th Cir. 2018). Thus, unless a negligent misrepresentation is tied inextricably with an actual fraud claim, the Fifth Circuit has

6

instructed that a negligent-misrepresentation claim is subject to Rule 8's pleading standard. *See Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 668–69 (5th Cir. 2004).

Returning to the simple negligence claim, ZT's allegations are sufficient to make that claim plausible. ZT's complaint does not include any plainly "conclusory" allegations, which the Supreme Court has described as allegations that amount to mere "labels and conclusions," are "formulaic recitations of a statute," or are otherwise unsupported accusations. *See Iqbal*, 556 U.S. at 678. While ZT does broadly state that Gallagher's projections concerning its medical plan were "erroneous" or "markedly inaccurate," ZT reinforces these allegations by highlighting how far off the mark Gallagher allegedly was with its projections—$1.7 million. To be sure, ZT does not eliminate "other" reasons that might have caused this shortfall, but assuming Gallagher's projections were negligent, as the court must, there are at least two data points—Gallagher's (currently unknown) actuarial projections and the plan's actual incurred claims. Gallagher's allegedly low-ball projection and the actual plan costs make it plausible that Gallagher's projections and resulting advice were negligent.

Other allegations also support the negligence charge's plausibility. For example, contrary to Gallagher's position, ZT does not baldly assert that Gallagher

7

owed it a legal duty. ZT instead alleges that it hired Gallagher, which held itself out as "an expert in the management and administration of self-funded health care plans," and ZT thus relied on Gallagher's directions. *See* Dkt. 13 ¶ 16–17. This supports an inference that Gallagher plausibly owed ZT a contractual or professional duty to act as a reasonably careful broker and employee-benefits consultant.

The same inference is found for the breach element. ZT alleges that the $1.7 million deficit was unexpected, which supports the inference that it instructed Gallagher to help structure the plan's finances in a manner that would ensure that any premiums collected would completely cover the plan's liabilities. *See* Dkt. 13 at ¶ 12, 19. If Gallagher owed a duty to reasonably fulfill these instructions, its alleged failure is plausibly negligent.

The same is true for ZT's allegation that Gallagher acted unreasonably by directing ZT to purchase an inadequate stop-loss policy. Certainly, that stop-loss contract's terms are surely plain about the amount it will pay out if the policy is triggered. *See Steadfast Ins. Co. v. SMX 98, Inc.*, No-H-06-2736, 2009 WL 890398, at *16 (S.D. Tex. Mar. 30, 2019). And to succeed on its claim, ZT will need to provide proof that the insurance that would have covered its damages was available at the time the insurance was purchased. *Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 836 (Tex. 2009). But Gallagher could have plausibly been negligent

8

when advising ZT on what type of stop-loss plan would best protect it, especially if Gallagher was negligent when projecting the self-funded plan's liabilities. Implicit within that allegation is that if the projections had been accurate, then ZT would have bought the appropriate insurance.

Finally, the alleged damages are specific: the $1.6 million that ZT paid to cover the plan's shortfalls.

In short, ZT's negligence claim is plausible and should not be dismissed.

### B. Breach of Contract

To establish a prima facie case for breach of contract, the plaintiff must show "(1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the breach." *Chapa v. Chase Home Fin. LLC*, No. C-10-359, 2010 WL 5186785, at *3 (S.D. Tex. Dec. 15, 2010) (applying Texas law).

In its reply, Gallagher cites *Payne v. Wells Fargo Bank, N.A.*, No. 3:12–CV–5219-M, 2013 WL 5451856 (N.D. Tex. Sept. 27, 2013), and *Chapa v. Chase Home Finance LLC*, 2010 WL 5186785, for the notion that a complaint for breach of contract must specifically allege which provisions were breached. But those cases are not analogous to this one.

Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief"—it does not require that the complaint necessarily include the specific contractual provisions that were allegedly breached. FED. R. CIV. P. 8(a)(2); *Iqbal*, 556 U.S. at 678 ("[Rule 8] does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." (quoting *Twombly*, 550 U.S. at 555)). In *Payne* and *Chapa*, both foreclosure cases, the plaintiffs alleged breach of contract or deed of trust. The courts in both cases concluded that the plaintiffs' complaints did not comply with Rule 8 because they did not identify what contract or provision among many documents had been breached. *Chapa*, 2010 WL 5186785, at *5; *Payne*, 2013 WL 5451856, at *7.

In this case, while the 2015 contract is not attached to the amended complaint, ZT does identify a *specific* contract and directly quotes provisions from that contract:

> Among many services specifically identified and promised by Gallagher to provide, Gallagher agreed to apply its specialized knowledge and expertise in self-funded employee benefit plan management to "forecast total plan costs," "project claim liability and cost implications of active employee health welfare benefits," provide "recommendations as to plan design, carrier selection and funding mechanism," as well as "recommend competitive employee and employer contribution strategies."

Dkt. 13 ¶ 22. At this stage, these allegations are enough to make ZT's breach-of-contract claim plausible.

### C. Causation and Damages

Finally, Gallagher argues that ZT's claims must fail as a matter of law because it can establish neither causation nor damages, elements shared by both negligence and breach of contract.

According to Gallagher, there are many reasons a self-funded plan could run a deficit, and ZT does not adequately discount those other reasons. Additionally, even taking all allegations as true, Gallagher's actions at most did "no more than furnish a condition which makes the injuries possible," which is not sufficient to show that the defendant's conduct is a substantial factor. Dkt. 17, PDF at 19 (quoting *Union Pump Co. v. Albritton*, 898 S.W.2d 773, 776 (Tex. 1995)). Gallagher could also not predict the numerous intervening acts that would follow its services for ZT in 2015, and those intervening acts severed any causal chain. ZT, Gallagher contends, was obligated to pay any deficits that the plan incurred, so ZT would have been responsible for paying these medical costs no matter the advice provided by Gallagher.

These causation arguments are unpersuasive. If anything, they highlight that there are fact issues about what exactly caused ZT's damages. But for the purposes of a 12(b)(6) motion, the court must construe ZT's allegations in its favor and limit

its review to the allegations in the complaint. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

Finally, Gallagher argues that ZT is impermissibly seeking a windfall instead of traditional contractual damages. ZT, Gallagher insists, accepted the risk of having to expend additional funds to cover any unexpected shortfalls.

These final arguments are similarly unavailing. The alleged $1.7 million deficit is relevant for calculating contractual damages. It is premature at this stage to determine what measure of damages is appropriate and does not answer whether the claim is implausible.

\*   \*   \*

For the above reasons, the court denies the motion to dismiss (Dkt. 17).

Signed on Galveston Island on the 30th day of March, 2021.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE